**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BRUCE A. MORRISON, d/b/a MORRISON PUBLIC AFFAIRS GROUP,<br><br>Plaintiff,<br>v.<br><br>PRIME TECHNOLOGY, LLC,<br><br>Defendant. | 3:07-CV-01705 (CSH) |

**MEMORANDUM OF DECISION**

HAIGHT, Senior District Judge:

Plaintiff Morrison Public Affairs Group ("MPAG") and defendant Prime Technology, LLC ("Prime") entered into a services agreement in April of 2005. The parties agree that Prime owes MPAG at least some unpaid fees and expenses, plus interest, but they dispute the amount. The matter comes before this Court on plaintiff's Motion for Summary Judgment [doc. #12]. The parties have requested oral argument on this Motion for Summary Judgment; however, in light of the submissions on the papers, the Court concludes that no argument is necessary.

**I. Facts**

In April of 2005, plaintiff and defendant entered into a "Consulting Services Agreement" (the "Agreement" or "Contract"), in which plaintiff MPAG agreed to deliver "professional consulting services" to defendant Prime, specifically to encourage and in furtherance of "contracts with or purchases by the Federal government," particularly related to naval and other defense projects. Decl. of Bruce A. Morrison [doc. #12-3], Ex. A, Consulting Services Agreement, at 1-2 [hereinafter "Agreement"].

Periods of performance under the Agreement were divided into "Phases," with the "initial

Phase I to be completed within six months," starting on April 7, 2005. Agreement at 3. Thus, Phase I lasted until October 6, 2005.

After the end of Phase I, MPAG submitted an "Interim Report" to Prime. That report was transmitted on October 25, 2005.

There is no dispute that after the end of Phase I, the Agreement renewed and Phase II began. But the parties disagree on the date when that happened: MPAG argues that Phase II began on October 7, 2005, while Prime argues that it began on October 31, 2005. Either way, the parties agree that during Phase II, MPAG continued to submit regular invoices against the annual retainer, and Prime made regular payments until July 31, 2006. [doc. #12-5] ¶ 10.

On August 24, 2006, Prime sent MPAG a written notice purporting to terminate the Agreement, memorializing a conversation to the same effect on the same day. MPAG rejected this termination because it believed the notice was not delivered 60 days prior to the expiration of Phase II, as the Agreement required.

Finally, the parties appear to agree that MPAG did not render any services to Prime during Phase III, although it continued to submit monthly invoices for that period, and MPAG was "available to provide services . . . during the entirety of the Phase III period." Decl. of Bruce A. Morrison [doc. #12-3] ¶ 5; *see also* Def.'s Local Rule 56(a)(2) Statement ¶ 20 (admitting this allegation).[1]

---

1 Similarly, all of the Phase III invoices, from November, 2006, through October, 2007, include a monthly charge "[f]or professional services rendered" but do not contain any charges for specific expenses incurred in the course of rendering those services. This contrasts sharply with the invoices for every month from September, 2005, through October, 2006, which itemized expenses incurred in the course of MPAG's work.

## II. Discussion

The parties do not dispute that the defendant owes to plaintiff $44,626.00 in fees that accrued during Phase II but which are still unpaid. The parties also do not dispute that several weeks before the end of Phase II, defendant Prime attempted to cancel the Agreement and prevent its automatic renewal for Phase III. The question before the Court, then, is whether Prime's attempt to prevent renewal of the Agreement was effective, and if not, what damages are owed to Plaintiff for Phase III of the Contract.

Defendant puts forward several reasons why it does not, in fact, owe any fees for Phase III. First, Prime argues that its notice of termination was timely under the Agreement, so Phase III never began under the Agreement's own terms. Because the question of timeliness turns on a matter of contractual interpretation, and because the Agreement is ambiguous in this respect, Prime argues that summary judgment is improper. Prime also argues that MPAG's failure to render any services during Phase III excuses its payment obligations; that it was free to ignore the requirement to give 60 days advance notice before termination because the Contract lacked a "time of the essence" provision; that awarding the lost Phase III profit would constitute an illegal penalty; that MPAG failed to mitigate its damages; and that it received "very little" consideration as a result of MPAG's services.

### A. Standard on a Motion to Dismiss

Rule 56(c) of the Federal Rules of Civil Procedure provides that a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008). "A fact is material when it might

affect the outcome of the suit under governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could [have] return[ed] a verdict for the [appellant]." *Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008) (brackets in original) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). "[U]nless the nonmoving party offers some hard evidence showing that its version of the events is not wholly fanciful, summary judgment is granted to the moving party." *Id.* (quoting *McCarthy*)).

"The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002); *see also Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006). "Ascertaining whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." *Lucente v. Int'l Business Machines Corp.*, 310 F.3d 243, 257 (2d Cir. 2002) (citing *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994)); *see also Palmieri*, 445 F.3d at 187.

**B. Plaintiff Is Entitled to a Judgment on Its Claim for an "Account Stated"**

Both parties agree that the Agreement eventually renewed for Phase II, and indeed, "Prime Technology, LLC acknowledges that it owes MPAG $44,626.00 in connection with Phase II of the agreement and is prepared to pay the same." Decl. of Raymon Sterman [doc. #15] ¶ 6. Sterman is the Chairman and CEO of Prime. His admission binds the company. *See also* Def.'s Objection to Motion for [doc. #14] at 1.

Because there is no genuine issue as to any material fact related to Count Two of MPAG's Complaint, for an "Account Stated," plaintiff is entitled to summary judgment on that count, in the amount of $44,626.00.

### C. Ambiguity Regarding the Starting Date for Phase II

Plaintiff's disputed claim for lost profits, based on breach of contract (Count One of the Complaint), turns on whether the Agreement renewed for Phase III. That question, in turn, boils down to a question of when Phase II began.

Defendant's central argument is that Agreement is ambiguous with respect to the date when Phase II began. If the Agreement is actually ambiguous, then the case would not be suitable for a disposition on summary judgment on at least the claim for breach of contract. *See Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) ("[G]enerally . . . a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. . . . Ambiguity here is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way.").

The Connecticut Supreme Court has provided clear and comprehensive guidance when examining a contract for existence of an ambiguity:[2]

> In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. A contract is unambiguous when its language is clear and conveys a definite and precise intent. The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. Furthermore, a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature.

---

2 The terms of the Agreement state that it "shall be governed and construed in accordance with the laws of the state of Connecticut." Aggr. § IV, at 5.

> In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. The contract must be viewed in its entirety, with each provision read in light of the other provisions; and every provision must be given effect if it is possible to do so. In addition, [w]hen there are multiple writings regarding the same transaction, the writings should be considered together in construing the contract. If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.

*United Illuminating Co. v. Wisvest-Connecticut, LLC*, 791 A.2d 546, 549-50, 259 Conn. 665, 670-71 (Conn. 2002) (collecting cases) (internal quotation marks and citations omitted); *see also Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 446 (2d Cir. 2005) (citing *United Illuminating* as a leading case for determining contractual ambiguity under Connecticut law).

The starting point for any inquiry into ambiguity is the plain language of the contract, giving its words "their natural and ordinary meaning." The Agreement contains a few provisions which directly affect, or indirectly describe, the intended duration of the "Phases":

- Section I, entitled "Scope of Services," states that "[a]t the conclusion of Phase I, subsequent *annual* Phases will commence, subject to the provisions below." (emphasis added).
- Section II, entitled "Timeframe," states that the Agreement is "effective on April 7, 2005. It provides for an initial Phase I to be completed within six months." It further states that "[t]he Agreement is effective for additional *one-year* Phases *beginning on October 7, 2005* unless and until terminated in the manner described below." (emphases added).
- Section IV, entitled simply "Contract Terms," contains a subsection labeled

"Discontinuing Services." That section states in full:

> Discontinuing Services. The Agreement shall continue in force until October 6, 2005, unless modified by mutual agreement. Phase II shall begin on October 7, 2005, *or as soon thereafter as a work plan for Phase II has been approved by Prime, provided that the approval shall occur no later than October 31, 2005*. Beginning with Phase II, the Agreement shall continue in effect from year to year unless terminated by either party giving sixty (60) days notice prior to the end of any Phase. However, either party may terminate this Agreement if the other party fails substantially to fulfill its obligations after reasonable notice of such failure and an opportunity to cure it. Notwithstanding termination of this Agreement, incentive payments based on Projects identified under this Agreement shall remain due and payable without modification for the minimum five-year period defined above.

(emphasis added).

Giving these words their plain and ordinary meaning, the plan I discern from the Agreement is that the parties intended for Phase I to last six months, and for each subsequent Phase to last one year, until the termination of the Agreement.

But as defendant Prime emphasizes, it is not clear exactly when the first of the one-year Phases begins. Two sentences, in different parts of the Agreement, address that question specifically. The first sentence, in Section II, is completely unambiguous: "The Agreement is effective for additional one-year Phases beginning on October 7, 2005 unless and until terminated in the manner described below." The second sentence, in Section IV, suffers from tortured grammar: "Phase II *shall begin* on October 7, *or as soon thereafter* as a work plan for Phase II has been approved by Prime, *provided that* the approval shall occur no later than October 31, 2005." Agreement § IV, at 5 (emphases added).

If the facts had turned out differently, the meaning of the second sentence would be clearer.

For instance, if MPAG had provided a clearly identified "work plan," and Prime had approved that work plan on a date certain between October 7 and October 31, then the phrase "or as soon thereafter as a work plan for Phase II has been approved by Prime" would take priority, and Phase II would commence on the date of Prime's approval.

Less clear is what would happen if no "work plan" was ever submitted,[3] or if one had been submitted but *not* approved by Prime between October 7 and October 31. Section II of the Agreement clearly prescribes, as a default, that Phase II would begin on October 7. But the phrase in Section IV — "or as soon thereafter as a work plan for Phase II has been approved by Prime, provided that the approval shall occur no later than October 31, 2005" — just as clearly assumes a default scenario where MPAG would approve a work plan for Phase II prior to October 7, since the function of the phrase is clearly to *delay* the start of Phase II if Prime needed more time to consider the content of that work plan.

If no work plan for Phase II was ever submitted, could the parties safely assume that Prime intended to renew the Agreement for Phase II? The Agreement is ambiguous on this point, and the parties explicitly disagree on the question of whether a work plan was required under the Agreement. *Compare* Pl.'s Reply Mem. at 3 ("The Agreement unambiguously shows that a work plan was not required . . . .") *with* Def.'s Mem. in Opp'n [doc. #14] at 8 ("It is quite clear that the Plaintiff was obligated to provide a work plan and present the work plan to the Defendant Prime for approval.").

---

3 The parties appear to agree that "MPAG never produced a Phase II work plan in accordance with the agreement and no Phase II plan was ever approved by Prime Technology, LLC." Decl. of Raymon Sterman [doc. #15] ¶ 4. However, the Agreement never defines what would constitute a "work plan" — indeed, the phrase appears only once, in that very sentence. Arguably, the "Interim Report" that plaintiff submitted in late October, discussed *infra*, was functionally equivalent to the envisioned "work plan," although it bore a different title.

In keeping with basic principles of contractual interpretation, I must give effect to all the language included in the Contract, because "[t]he law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous." *United Illuminating*, 791 A.2d at 552; *see also Ramirez*, 938 A.2d at 586. According to plaintiff, "[c]onstruing the agreement to give effect to the provision for an October 7, 2005 Phase II start date implies that the work plan was optional, not required, and in its absence, Phase II would start on October 7, 2005." That is not the case, for reasons I have already described. The October 7, 2005 start date is given ample effect by the assumption, implicit in the Agreement, that a work plan would be produced. If that work plan was approved prior to October 7, 2005, then this provision would be given effect, and Phase II would begin on October 7, 2005.

Finally, Connecticut law requires that I interpret this contract "with each provision read in light of the other provisions." *United Illuminating*, 791 A.2d at 550. Taking the Agreement as a whole, I see no broader resolution to the questions of whether the work plan was required, what was to be done in its absence, and whether, in its absence, Phase II would begin on October 7 or October 31. The parties clearly preferred, by default, for the agreement to be continuous between its Phases — that is, for Phase II to begin on October 7. But the parties also clearly preferred, by default, to have a work plan for Phase II, and the absence of one produces ambiguous results.

### 1. Contra Proferentem Does Not Apply

Defendant also invokes the doctrine of *contra proferentem*, Def.'s Mem. in Opp'n [doc. #14] at 8, 15, which directs that "ambiguities are to be construed unfavorably to the drafter." Black's Law Dictionary, "contra proferentem" (8th ed. online 2004). Connecticut courts endorse this widely accepted principle of interpretation: "[w]here the language is ambiguous . . . we must construe those

ambiguities against the drafter." *Ramirez v. Health Net of Northeast, Inc.*, 938 A.2d 576, 586, 285 Conn. 1, 13-14 (Conn. 2008) (quoting *Cantonbury Heights Condominium Ass'n v. Local Land Dev., LLC*, 873 A.2d 898, 273 Conn. 724, 735 (Conn. 2005)) (internal quotation marks and citations omitted).

However, the mere existence of ambiguity does not necessarily imply that the Court must construe the ambiguity against the drafting party — in this case, the plaintiff.

> *The objective of contract interpretation is to give effect to the expressed intentions of the parties*. Rules of construction such as the principle that in certain circumstances a contract may be construed adversely to the party that drafted it *are principles of last resort*, to be invoked when efforts to fathom the parties' intent have proved fruitless.

*Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989) (emphases added). The Connecticut Supreme Court, too, has opined that the principle of *contra proferentem* is to be used only in limited circumstances, in the most recent opinion to advance a reasoned explanation of that principle. "That rule tilts the balance against the party who actually drew the contract *whenever two interpretations of a contractual provision seem equally possible*." *Ravitch v. Stollman Poultry Farms, Inc.*, 328 A.2d 711, 717, 165 Conn. 135, 145-46 (Conn. 1973) (emphasis added).

In other words, the doctrine of *contra proferentem* works as a tiebreaker in close cases, and as a matter of last resort. It should not be applied if the intent of the parties can be discerned more clearly by examining another source — such as extrinsic evidence. If such an examination requires the assistance of a jury, then the principle should be applied only after the fact finder's "efforts to fathom the parties' intent have proved fruitless." *Record Club of Am.*, 890 F.2d at 1271.

**2. Extrinsic Evidence Does Not Resolve the Ambiguity**

MPAG argues that "[e]ven where an agreement is ambiguous, summary judgment is appropriate where the extrinsic evidence resolves the ambiguity." Pl.'s Reply Mem. at 5 (citing *Compagnie Financiere de Cic et de L'Union Europeene v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000), as well as a 1999 case from the Southern District of New York, and a 1998 case from the Western District of New York).

Plaintiff's argument oversimplifies the law in the Second Circuit for summary judgment in a contract dispute. The Second Circuit usually looks unfavorably upon granting summary judgment whenever an agreement is ambiguous. *See Lucente v. Int'l Business Machines Corp.* 310 F.3d 243, 257 (2d Cir. 2002) ("When the language of a contract is susceptible to different interpretations and 'where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment.'" (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (internal quotations omitted))).

In a recent discussion of *Compagnie Financiere*, the Second Circuit wrote:

> [A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. . . . To the extent the moving party's case hinges on ambiguous contract language, *summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case*.

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (citing *Compagnie Financiere*, 232 F.3d at 157-58) (emphasis added).

In this case, plaintiff has submitted several documents that could be considered extrinsic evidence of the parties' intent, although these documents tend to address MPAG's intent more than they address Prime's intent. I address these various types of evidence in turn.

**a. Correspondence Between MPAG and Prime**

There is correspondence that suggests that Prime regarded October 7, 2005, as the start of Phase II, and other correspondence — whose authenticity plaintiff challenges — suggesting that Prime believed that Phase II began on October 31, 2005.

Specifically, plaintiff claims that certain correspondence produced by defendant Prime was actually manufactured for the purposes of litigation. *See* Pl.'s Mem. at 9-11; Decl. of Bruce A. Morrison [doc. #12-4], Exs. H-K. If proven, this disturbing allegation would almost certainly influence the trier of fact's understanding as to the parties' intent when entering into the Agreement.

Nevertheless, the question of the letter's authenticity is precisely the kind of credibility assessment that should be preserved for trial. Live testimony by the relevant parties, subject to cross-examination, will form a much better foundation for determining the authenticity of these documents than the self-serving allegations made by the parties in their affidavits.

**b. MPAG's "Interim Report"**

As I have already mentioned, MPAG issued an "Interim Report" on October 25, 2005, which summarized the results of Phase I. The Interim Report also proposes — or perhaps constitutes — an amendment of at least some of the Agreement's terms. This can be inferred because important terms regarding monthly payments were changed around this time, as plaintiff alleges in its Local Rule 56(a)(1) Statement:

> The billing schedule for Phase II *was revised* from 12 equal retainer

> billings of $12,500 each (to total $150,000) to 10 equal $15,000 billings. MPAG billed Prime $15,000 monthly from January through October 2006, and Prime made monthly payments until July 31, 2006, when its last regular monthly payment was received by MPAG.

¶ 10 (emphasis added); *see also* Def.'s Local Rule 56(a)(2) Statement [doc. #16] ¶ 10 (admitting same). Plaintiff neglects to mention *how* the agreement "was revised." Instead, in support of this allegation, plaintiff cites to the January through October 2006 invoices, which reflect an amended payment scheme. Pl.'s Ex. D. at MPAG00048-60. It appears, however, that the billing schedule for Phase II "was revised" considerably earlier, since the invoices from November and December of 2005 omit the charge for "professional services rendered" that would have otherwise appeared, and which do appear on earlier and later invoices. *See* Pl.'s Ex. D at MPAG00061, MPAG00063.[4] While the invoices clearly *reflect* an amendment of the Agreement, they do not appear to have been the *cause* of such an amendment.

The most logical inference is that the billing schedule for Phase II "was revised" by Prime's acceptance of a proposal put forward in the Interim Report that MPAG submitted to Prime on October 25, 2005. That report states:

> The submission of this report concludes the initial Phase of our contract and triggers a decision by Prime on continuing into Phase II. This report has been delayed beyond October 7, so we would not expect a formal confirmation of continuation until the end of November (as opposed to October 31).
>
> In anticipation of a positive decision, we are continuing to

---

4 Those invoices do include "Professional Services" charges for $10,000 and $5,000 in November and December, respectively, but those are remaining monthly amounts from Phase I, as set forth in Section IV of the Agreement: "For Phase I, two payments of $10,000 . . . are acknowledged. Additional monthly retainer payments are due as follows: five monthly payments of $10,000 on July 7 through November 7, 2005; and one payment of $5,000 on December 7, 2005."

> work on the pending projects, and we would expect to treat Phase II as running from October 7, 2005 through October 6, 2006 as specified in the contract. In light of the extended payment schedule of Phase I, we would propose to break the $150,000 Phase II retainer into 10 equal installments beginning on January 7, 2006.

Letter from Bruce A. Morrison, Chairman of MPAG, to Raymon S. Sterman, Chairman & CEO of Prime Technology LLC, Oct. 25, 2005, Pl.'s Ex. B [doc. #12-3] at MPAG00009-10.

These paragraphs from the Interim Report — and in particular the statement that its submission "triggers a decision by Prime on continuing into Phase II" — also support the inference that MPAG might have considered this report to serve as, or at least be equivalent to, the "work plan" required under the Agreement.[5] Even if the Interim Report did not replace the work plan envisioned under the termination provisions of Section IV, the first paragraph in the transmittal letter above *clearly speaks* to those termination provisions.

Yet neither party addresses the effect of that paragraph on the Agreement. As I have already said, the second paragraph quoted above, concerning the schedule for payments under the Agreeement, appears to be a proposed amendment to the Agreement — one that Prime accepted. The first paragraph, too, suggests a proposal to amend the terms of the Agreement: "*we would not expect a formal confirmation of continuation until the end of November (as opposed to October 31).*" (emphasis added). If anything, this proposal makes the ambiguous portion of Section IV of the Agreement even *more* ambiguous. Should this be read as an offer to tender non-conforming performance — a late "Interim Report" instead of a timely work plan — with commensurate modifications in the termination schedule of Section IV of the Agreement? Did Prime accept this proposal? Neither of these questions can be addressed on the current record and at the current stage.

---

[5] Nevertheless, the parties agree that MPAG never submitted a work plan.

**D. Prime's Attempt To Terminate The Agreement**

In addition to the verbal and written notice provided on October 24, 2006, Prime also alleges that MPAG already understood prior to that date that "termination of the agreement was inevitable." Decl. of Raymon Sterman [doc. #15] ¶ 9. Specifically, Prime's Chairman and CEO alleges:

> 9. During the summer of 2006, but prior to delivery of the termination letter of August 24, 2006, I addressed my concerns directly to Bruce Morrison that MPAG failed to obtain any work for Prime Technology, LLC, and that MPAG was draining cash from the company at a time when it was under considerable financial stress. In these discussions, I was clear with Bruce Morrison that Prime Technology could no longer afford MPAG's services as it had not produced any return on Prime Technology's investment, and that termination of the agreement was inevitable. Mr. Morrison refused to accept my concerns.
>
> 10. Although the agreement does not require written notice of termination, I sent the August 24, 2006 [letter] for sake of clarity, based on Mr. Morrison's refusal to accept the fact that Prime Technology was no longer in a position to continue with the agreement, nor renew the agreement or extend the term.

*Id.*

The implication, of course, is that Prime sought to terminate the Agreement *prior* to its August 24, 2006 notice to that effect. Section IV of the Agreement also provides that "either party may terminate this Agreement if the other party fails substantially to fulfill its obligations after reasonable notice of such failure and an opportunity to cure it." Since nothing in the Agreement appears to require written notice of termination,[6] it is possible that a jury could conclude that Prime's earlier conversations amounted to either a without-cause termination, under the 60-day notice

---

[6] Because it is not dispositive to the outcome of this motion for summary judgment, I do not address the potential applicability of the statute of frauds to renewal or termination of the Agreement.

provision of Section IV, or perhaps even a for-cause termination, so long as Prime's communications amounted to a "reasonable" notice of termination and opportunity to cure.

**III. Conclusion**

Because the Agreement is ambiguous with respect to the date on which Phase II began, and because extrinsic evidence cannot resolve that ambiguity conclusively at this stage, the Court cannot yet determine whether Prime successfully prevented the Agreement from renewing for Phase III.

For the foregoing reasons, plaintiff's Motion for Summary Judgment is therefore DENIED as to Count One (breach of contract) and GRANTED as to Count Two ("Account Stated").

It is SO ORDERED.
Dated: New Haven, Connecticut
February 23, 2009

*/s/ Charles S. Haight, Jr.*
Charles S. Haight, Jr.
Senior United States District Judge